IN THE UNITED STATES DISTRICT COURT
FOR THE WESTEN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HUSTON-TILLOTSON UNIVERSITY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:20-CV-00192-RP |
| | § | |
| SPRINT CORPORATION, | § | |
| NEXTEL SPECTRUM | § | |
| ACQUISITION CORPORATION, | § | |
| and NORTHERN ARIZONA | § | |
| UNIVERSITY FOUNDATION, INC. | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Huston-Tillotson University ("Huston-Tillotson") files this Original Complaint against Sprint Corporation ("Sprint") and Sprint's wholly owned subsidiary Nextel Spectrum Acquisition Corporation ("NSAC") (collectively, "Sprint"), and Northern Arizona University Foundation, Inc. ("NAUF"), and would show as follows:

## THE PARTIES

1.     Plaintiff Huston-Tillotson is a nonprofit corporation incorporated in the State of Texas with its principal place of business at 900 Chicon Street, Austin, Texas 78702, and is thus a citizen of the State of Texas.

2.     Defendant NSAC is for profit corporation incorporated in the State of Delaware with its principal place of business at 2000 Edmund Halley Drive, Reston, Virginia 20191, and is thus a citizen of the State of Virginia and Delaware. NSAC is a wholly-owned subsidiary of Sprint and may be served through its registered agent for service, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808.

3.      Defendant Sprint is a for profit corporation incorporated in the State of Delaware with its principal place of business at 6200 Sprint Parkway, Overland Park, Kansas 66251, and is thus a citizen of the State of Kansas and Delaware. Sprint may be served through its registered agent for service, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808.

4.      Defendant NAUF is a nonprofit corporation incorporated in the State of Arizona with its principal place of business at 620 S. Knoles, P.O. Box 4094, Flagstaff Arizona 86011, and is thus a citizen of the State of Arizona. NAUF may be served through its registered agent for service, Hufford Horstman Mongini Parnell & Tucker P.C., 120 N. Beaver Street, Flagstaff, AZ, 86001.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Huston-Tillotson's claims because the amount in controversy exceeds $75,000 and complete diversity of citizenship exists between the Plaintiff and all Defendants. 28 U.S.C. § 1332.

6.      This Court has personal jurisdiction over all parties because Huston-Tillotson's claims relate to and arise from wrongs committed by Sprint and NAUF pursuant to an Airtime Use and Royalty Agreement (the "Royalty Agreement") that Sprint entered with Huston-Tillotson in Texas. As evidenced by the terms of the Royalty Agreement, it contemplates at least some performance by Sprint in Texas, and concerns property rights and airwaves located in Texas. Additionally, Sprint and NAUF have purposefully directed conduct in Texas by creating, or attempting to create, a business relationship with Huston-Tillotson concerning the property located in Texas, and have extended their services and products to customers and entities in Texas on a continuous and systematic basis.

7150346v1/016690

7.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Huston-Tillotson's claims occurred in this district, and the property giving rise to this dispute is situated in this district.

## FACTUAL BACKGROUND

8.  Huston-Tillotson is a Historically Black College and University located in Austin, Texas with an enrollment of approximately 1,100 students. Because of its status as an educational institution, the Federal Communications Commission ("FCC") granted Huston-Tillotson a license to hold an asset then known as Instructional Television Fixed Service ("ITFS"). ITFS was a band of radio and television channels designed for educational institutions to deliver instructional television to students engaged in distance learning. Huston-Tillotson's license operates under the call sign WLX254 in the FCC's Geographic Service Area ("GSA") for Austin, Texas.

9.  Due to widespread development of wireless broadband service, the FCC expanded ITFS usage to include high-speed internet access, and changed the name of ITFS to Educational Broadband Service ("EBS"). ITFS was an analog television-like service, while EBS is a broadband service, but both use the same 2.5 GHz spectrum bandwidth formerly associated with ITFS.

10. Telecommunications companies are allowed by the FCC to lease excess spectrum capacity on EBS channels from nonprofit FCC licensees like Huston-Tillotson, to support the telecommunication industry's commercial 3G, 4G, and 5G technology. As telecommunications have continued to rely more heavily on this 2.5 GHz "mid-band spectrum" to support their latest technology, the value of EBS channels has significantly increased over time.

## The Airtime Use and Royalty Agreement

11. On January 7, 2005, Huston-Tillotson entered into the Royalty Agreement with Sprint. The Royalty Agreement provides Sprint a lease to use and operate a portion of the radio

and television spectrum rights that Huston-Tillotson owned under its ITFS license, and currently owns under its EBS license. This dispute arises out of Sprint's wrongful conduct concerning the Royalty Agreement.

12.     FCC rules limited ITFS leases entered into before January 10, 2005 to a maximum term of fifteen (15) years, referred to by the FCC as "grandfathered leases." Huston-Tillotson and Sprint originally entered into the Royalty Agreement on January 7, 2005. Pursuant to the FCC's maximum 15-year limit on grandfathered leases, the Royalty Agreement was set to expire, and did expire, on January 7, 2020 (the "termination date").

13.     Section II of the Royalty Agreement contains a Right of First Refusal provision that restricts Huston-Tillotson's ability to assign or transfer any direct or indirect interest in Huston-Tillotson's lease to a third party without first offering Sprint an opportunity to accept the same material terms or conditions. Section II(d) of the Right of First Refusal provision further restricts Huston-Tillotson's ability to negotiate or contract with any third party while the Royalty Agreement is in effect. It states:

> While this Agreement is in effect, [Huston-Tillotson] shall not negotiate or contract with any third party to sell, assign, transfer or use, or to limit the sale, assignment, transfer or use, of the whole or any part of the ITFS Channels or Licenses involving any period during or after the time this Agreement is in effect.

14.     Section IV of the Royalty Agreement, entitled Royalty Fee, requires Sprint to pay royalties of approximately ███████████, and a total of approximately ██████ for the entire 15-year term. Section IV(f), entitled Operator's Right to Acquire ITFS Channels Authorizations, further provides that Sprint has a right to acquire Huston-Tillotson's license "***at any time this Agreement is in effect***," for approximately ██████—substantially less than the total royalty payments for the maximum 15-year term. It provides:

Operator shall have the right to acquire the License(s) for the ITFS Channels at any time this Agreement is in effect, for ████████████████████████████. Operator may exercise such right itself or to assign such right to Operator's designee.

15.      Section IV(g) provides that "[t]o exercise its assignment rights under Subsection IV(f) on one or more occasions, Operator or its designee shall give notice to Licensee at any time prior to the end of this agreement indicating the License rights Operator elects to acquire." However, the Royalty Agreement makes clear that Sprint's right to acquire Huston-Tillotson's license does not survive the termination of the agreement.

16.      Section XXII of the Royalty Agreement expressly states that "Sections II, III, VII(d), XIV, XV, XVIII and XIX shall survive the ending of this Agreement, regardless of the cause of such ending." Section IV governing "Operator's Right to Acquire" is expressly omitted from the list of provisions that survive the termination of the agreement, which means Sprint's right to acquire Huston-Tillotson's license cannot survive termination of the Royalty Agreement. Section XXII of the Royalty Agreement also states that "[i]n the case of any provision in this Agreement providing a time for action, or which sets deadlines for performance (including a requirement of prompt performance), such time or deadline shall be deemed of the essence to the provision."

17.      Section IV(f) itself expressly contemplates that any acquisition pursuant to "Operator's Right to Acquire" must occur while the Royalty Agreement still is in effect, and may not occur after the Royalty Agreement terminates. For example, it says "[i]n the event of a purchase of all or the remainder of the License rights to the ITFS Channels, this Agreement shall terminate." This contemplates a Royalty Agreement that still is in effect and not already terminated at the time of purchase. It further provides that "[i]n the event of any partial purchase of the License rights to the ITFS Channels, Operator may elect to either (i) terminate this Agreement, or (ii) continue this

Agreement." This again contemplates that there still is an agreement in effect to terminate or continue at the time of acquisition. It also says that "[i]n the event this Agreement is continued after any partial purchase of License rights, (A) Operator shall retain the right to acquire the remaining License rights to the ITFS Channels in one or more purchases." This again contemplates that the agreement has not terminated by its terms or by FCC rules at the time of acquisition.

18.     Indeed, not a single provision of the Royalty Agreement references or contemplates an acquisition of Huston-Tillotson's license that occurs after the Royalty Agreement has terminated. Instead, the Royalty Agreement makes clear that Sprint has no right to acquire Huston-Tillotson's license after the Royalty Agreement terminates on January 7, 2020.

### SoniqWave's Third Party Offer

19.     On October 11, 2019, a few months before the termination date, Huston-Tillotson received an unsolicited letter of interest from a third-party named SoniqWave Network, LLC ("SonicWave"). SoniqWave offered to enter a royalty agreement worth over █████ in annual royalty payments. SoniqWave also offered to enter a purchase option agreement that would purchase Huston-Tillotson's license for over █████.

20.     SoniqWave's offer provided substantially more compensation to Huston-Tillotson than the existing Royalty Agreement with Sprint. SoniqWave's offer further demonstrated that Sprint's 15-year-old Royalty Agreement contained royalty and acquisition payment amounts that were well-below market value and completely unreasonable for Huston-Tillotson to accept in the current EBS market.

21.     SoniqWave's offer greatly interested Huston-Tillotson and would provide severely needed funding for Huston-Tillotson's educational mission and infrastructure. However, the Royalty Agreement included a Right of First Refusal provision that prohibited Huston-Tillotson

from entering any negotiations or contract with any third party to sell, assign, transfer, or use Huston-Tillotson's license while the Royalty Agreement was in effect. Fearing a breach of contract battle with one of the largest telecommunications companies in the United States, Huston-Tillotson awaited the January 7, 2020 termination date to commence earnest contract negotiations with SoniqWave.

### Sprint's Proposed Short-Term Renewal Agreement

22.     On October 25, 2019, in an effort to extend the agreement with Huston-Tillotson past the termination date imposed by the FCC's 15-year maximum term restriction, Sprint sent Huston-Tillotson a proposed short-term renewal agreement that would renew the Royalty Agreement for one year beginning on January 7, 2020. The short-term renewal agreement would have slightly increased the monthly royalty payments, and would have extended by another year Sprint's right to acquire Huston-Tillotson's license for ████.

23.     Huston-Tillotson clearly communicated to Sprint that Huston-Tillotson could not accept Sprint's proposed renewal agreement because the proposed royalty and acquisition payments were well-below market value and did not adequately compensate Huston-Tillotson for use of its EBS license.

24.     In response, Sprint steadfastly refused to negotiate the terms of its proposed renewal agreement, and refused to increase the proposed payment amounts to adequately compensate Huston-Tillotson for the increased value of EBS license rights in Austin, Texas. Sprint did not account for the unequal marketing positions and inherent inequality of negotiations between a huge telecommunications conglomerate and small historically black university.

25.     Instead, on December 16, 2019, less than a month before the termination date, Sprint fully embraced the inequalities of its position and threatened Huston-Tillotson that it would

exercise its right to acquire Huston-Tillotson's license if Huston-Tillotson did not immediately accept the short-term renewal agreement on the below-market terms that Sprint originally offered. Knowing that the Royalty Agreement would soon terminate, Huston-Tillotson refused to accept Sprint's proposed below-market renewal.

<u>**Sprint's Ineffective Bad Faith Assignment**</u>

26.     On December 30, 2019, during Huston-Tillotson's school holiday break and one week before the termination date of the Royalty Agreement, Sprint sent Huston-Tillotson a notice that it planned to assign Sprint's rights and obligations to Northern Arizona University Foundation ("NAUF"). At the time, Huston-Tillotson had never heard of NAUF. Sprint did not provide any information about NAUF or NAUF's capability to perform any obligations of Sprint as the Operator. And Sprint failed to obtain Huston-Tillotson's prior written consent to assign rights or obligations to NAUF.

27.     Section XIII of the Royalty Agreement provides that Sprint may "sell, assign, delegate or transfer this Agreement or any of its rights or obligations hereunder to any entity demonstrating capability to perform the obligations of Operator hereunder." It further provides that "Operator otherwise may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Licensee, which consent shall not unreasonably be withheld, conditioned, or delayed." Sprint, however, failed to provide any information to Huston-Tillotson demonstrating NAUF's "capability to perform the obligations of Operator," and Sprint never sought or obtained Huston-Tillotson's written consent to any assignment or transfer to NAUF.

28.     Section VII of the Royalty Agreement provides that the "Operator will provide Licensee with shared access and use" of "the shared transmit antennas, combiner network, waveguide and other radio frequency equipment necessary to transmit the ITFS Channels." It

further provides that "Operator shall cause the repair or the replacement of malfunctioning Transmission Equipment at its expense." It also provides that "Operator shall provide Licensee with, or any access to, Transmission Equipment at the Transmission Site to the extent necessary for Licensee to comply with the minimum FCC requirements to program or use ITFS channels." Sprint has failed to demonstrate that NAUF possess the capability of performing any of these obligations.

29.     Based upon publicly available information, NAUF has never demonstrated the capability to perform the obligations of Operator. Instead, NAUF has served as a strawman conduit that Sprint uses to strip small educational institutions of their EBS licenses. Sprint and NAUF do not readily disclose their strawman financial relationship. However, publicly available information indicates that Sprint has simply transferred money to NAUF so that NAUF can acquire EBS licenses from small educational institutions, and then lease those licenses right back to Sprint.

30.     Moreover, NAUF never performs the obligations of the Operator. Instead, NAUF serves as Sprint's strawman that purchases EBS licenses with Sprint's funding, then leases the licenses back to Sprint without ever performing any obligations of an Operator. NAUF's consolidated financial statements plainly describe its strawman conduit role, and provides:

> the Foundation has entered into an agreement to purchase EBS licenses with initial funding of $15,000,000 from an outside corporation [Sprint]. Under the agreement, the Foundation purchases EBS licenses and then subsequently leases the licenses to [Sprint] the outside corporation.[1]

31.     Sprint uses this strawman structure to circumvent FCC rules that prohibit commercial entities from holding licenses for Educational Broadband Service. Specifically, FCC rules provide that a license for an EBS station may be issued "only to an accredited institution or

---

[1] *See* Northern Arizona University Foundation, Inc. and Subsidiaries, Consolidated Financial Statements, June 30, 2017, available at: https://nau.edu/wp-content/uploads/sites/61/2018/05/2017_Final_FS_NAUF_127280.pdf

to a governmental organization engaged in the formal education of enrolled students or to a nonprofit organization whose purposes are educational and include providing educational and instructional television material to such accredited institutions and governmental organizations." 47 C.F.R. § 27.1201.

32.     There was never an attempt to demonstrate NAUF's "capability to perform the obligations of Operator" under the Royalty Agreement. To the contrary, the Arizona Auditor General recently concluded that Northern Arizona University "inappropriately paid for $40,277 of the [University] President's and her spouse's travel expenses that conflicted with policies and lacked appropriate documentation, which put public monies at potential risk of misuse." In response to the audit and reports of potential malfeasance, Northern Arizona University reported that NAUF ultimately covered the University for the inappropriate travel expenses.[2]

33.     Further, Northern Arizona University recently reported that it missed its target enrollment by at least 800 tuition-paying students, resulting in $10 million in lost tuition and fees that have already been allocated. Reports indicated that departments across the university were ordered to return $11 million in funds before June 2019 to avoid ending the fiscal year with a deficit.

34.     Sprint's strawman tactics for NAUF, reported malfeasance of NAU's president, the $11 million shortfall in NAU's budget, and NAUF's propensity to cover NAU's inappropriate expenses, raises legitimate concerns that NAUF is incapable of performing any obligations of Operator under the Royalty Agreement now or in the future.  Accordingly, Sprint needed to obtain Huston-Tillotson's prior written consent before attempting any purported assignment to NAUF.

---

[2] See Arizona Auditor General Report on Internal Control and on Compliance, Northern Arizona University, Year Ended June 30, 2019, available at: https://www.azauditor.gov/sites/default/files/NorthernArizonaUniversityJune30_2019ReportOnInternalControlAndOnCompliance.pdf

### NAUF's Failed Acquisition Attempt

35.     On January 3, 2020, just four days before the termination date, Huston-Tillotson received a letter from NAUF purporting to provide notice of its exercise of assignment rights to acquire Huston-Tillotson's license. However, NAUF did not provide notice with sufficient time before the termination date to obtain FCC consent to any assignment whatsoever, let alone the acquisition of Huston-Tillotson's license beyond the FCC's 15-year term limitation. NAUF also failed to demonstrate that it possessed any capability to perform the obligations of an Operator.

36.     On January 7, 2020, the Royalty Agreement terminated pursuant to the FCC's 15-year maximum term limitation. As of January 7, 2020, the Royalty Agreement ceased to have any force or effect except for certain described sections which survived termination. NAUF failed to obtain the FCC's consent to any assignment of rights or obligations, failed to acquire Huston-Tillotson's license, and failed to make any acquisition payment before the termination date. NAUF's failure is significant because the Royalty Agreement makes clear that the right to acquire Huston-Tillotson's license does not survive the termination of the Royalty Agreement.

37.     In addition, the proposed assignment agreement between Huston-Tillotson and NAUF itself states that the "assignment will not be effective until an application for such assignment has been filed and granted by the Federal Communications Commission." Based upon the plain language of the Royalty Agreement and the proposed assignment agreement, NAUF had to obtain consent from the FCC before any assignment of rights or obligations in the Royalty Agreement could be effective or enforced against Huston-Tillotson. Accordingly, NAUF had no right, and continues to have no right, to acquire any portion of Huston-Tillotson's EBS license.

7150346v1/016690

## Huston-Tillotson's Right of First Refusal Notice

38.     On February 20, 2020, Huston-Tillotson sent Sprint a Right of First Refusal ("ROFR") letter informing Sprint that Huston-Tillotson obtained a bona fide, unconditional, and continuing written third-party offer from SoniqWave to purchase Huston-Tillotson's license. Huston-Tillotson further offered Sprint an opportunity to enter an agreement with Huston-Tillotson under the same material terms as SoniqWave's third-party offer.

39.     According to Section II of the Royalty Agreement, Sprint has forty-five (45) days from its receipt of the ROFR notice to inform Huston-Tillotson that it accepts the same material terms and conditions as those presented in the ROFR notice. If Sprint does not accept the offer within forty-five (45) days of receipt, then Huston-Tillotson may enter an agreement with the third-party under the same terms and conditions as the offer.

## CLAIMS FOR RELIEF

## First Claim for Relief – Declaratory Judgment

40.     Huston-Tillotson realleges and incorporates by reference all the paragraphs above into this claim for relief.

41.     Pursuant to the terms of the Royalty Agreement, Huston-Tillotson respectfully requests a declaratory judgment that Sprint and NAUF have no right to acquire Huston-Tillotson's EBS license, and that Sprint must comply with the Right of First Refusal provisions of the Royalty Agreement in response to Huston-Tillotson's ROFR notice. Specifically, Huston-Tillotson seeks a declaration that:

    a.   The Royalty Agreement terminated on January 7, 2020;

    b.   Sprint and NAUF have no right to acquire Huston-Tillotson's license after the Royalty Agreement terminated on January 7, 2020;

7150346v1/016690

c.  Sprint and NAUF failed to promptly acquire Huston-Tillotson's license before the Royalty Agreement terminated on January 7, 2020;

d.  Any right to acquire Huston-Tillotson's license terminated on January 7, 2020, and did not survive the termination of the Royalty Agreement;

e.  Any obligation Huston-Tillotson had to cooperate with an acquisition of its license terminated on January 7, 2020, and did not survive the termination of the Royalty Agreement;

f.  Neither Sprint nor NAUF demonstrated that NAUF is capable of performing the obligations of Operator;

g.  Sprint failed to obtain prior written consent for any assignment to NAUF;

h.  Sprint failed to provide timely and adequate notice of assignment to NAUF;

i.  NAUF failed to provide timely and adequate notice of its exercise of a right to acquire Huston-Tillotson's license and did not provide notice with sufficient time before the termination date to obtain FCC consent to any assignment;

j.  Sprint is subject to the terms of the Right of First Refusal in the Royalty Agreement;

k.  Unlike the right to acquire that terminated when the Royalty Agreement terminated on January 7, 2020, Sprint's obligation to comply with the terms of the Right of First Refusal extends beyond January 7, 2020, and survives the termination of the Royalty Agreement;

l.  If by the forty-fifth day Sprint does not accept the same material terms and conditions presented in the Right of First Refusal notice, Huston-Tillotson may enter an agreement under the same terms and conditions presented in the notice.

42.     This dispute presents a justiciable controversy that will be resolved by awarding declaratory relief because Sprint improperly attempted to assign Huston-Tillotson's license to NAUF without obtaining Huston-Tillotson's prior written consent, and has improperly attempted to acquire Huston-Tillotson's license after the Royalty Agreement terminated.

43.     Huston-Tillotson requests a speedy hearing to resolve this action for declaratory judgment.

### Second Claim for Relief – Breach of Contract Against Sprint

44.     Huston-Tillotson realleges and incorporates all the paragraphs above into this claim for relief.

45.     Section IV(f) of the Royalty Agreement says Sprint only has the "right to acquire the License(s) for the ITFS Channels at any time this Agreement is in effect." Sprint's attempt to force an acquisition of Huston-Tillotson's license after the final termination date is a breach of the agreement. Section IV's structure and plain language support this interpretation because it provides that the lease shall terminate in the event of a purchase of all the license rights, and contemplates that the acquisition purchase occurs before the Royalty Agreement terminates. Section XXII further supports this interpretation by explaining that Section IV, governing the acquisition option, does not survive the termination of the agreement.

46.     Section XIII provides that Sprint may assign its rights in the agreement to "any entity demonstrating capability to perform the obligations of Operator." However, neither Sprint nor NAUF provided Huston-Tillotson anything to demonstrate NAUF's capability to perform any obligations of Sprint as the Operator under the Royalty Agreement. Absent a demonstration of NAUF's capabilities, the Royalty Agreement provides that Sprint "may not assign or transfer its rights or obligations under this Agreement without the prior written consent of Licensee."  Sprint

failed to obtain Huston-Tillotson's prior written consent and has thus breached the Royalty Agreement.

47.     Section XII of the Royalty Agreement provides that Sprint represents and warrants that "this Agreement has been duly executed and delivered by it and constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with its terms *except as such enforcement may be limited by* insolvency laws, *general principles of equity and FCC Rules*." Given Sprint's repeated attempts to circumvent FCC rules and deprive Huston-Tillotson of its ability to negotiate payment for its license at fair market value, general principles of equity dictate that Sprint is prevented from forcing Huston-Tillotson into  an approximately ▮▮▮ buyout when Huston-Tillotson has a valid purchase offer for over ▮▮▮. Considering that Sprint is a large telecommunications company that operates over 70% of the EBS licenses in the U.S., and Huston-Tillotson is small college with just over 1,100 students, general principles of equity hold that Sprint's bad faith conduct is unacceptable, and in material breach of the contract.

48.     Huston-Tillotson has satisfied all conditions precedent and obligations required by the Royalty Agreement.

49.     Sprint is in breach of the obligations imposed on it in the Royalty Agreement.

**Third Claim for Relief – Fraud by Nondisclosure**

50.      Huston-Tillotson realleges and incorporates all the paragraphs above into this claim for relief.

51.     In its correspondence to Huston-Tillotson, Sprint represented that it "may assign any of its rights or obligations under the Agreement to any entity demonstrating capability to perform the obligations of Operator." Subsequently, NAUF represented that Sprint "assigned  its

rights under Sections IV(f) and IV(g) under the Lease to the Northern Arizona University Foundation."

52.     However, neither Sprint nor NAUF disclosed to Huston-Tillotson that NAUF never intended to perform, and could not perform, the obligations of Operator. Neither Sprint nor NAUF disclosed to Huston-Tillotson that NAUF serves as Sprint's strawman that purchases EBS licenses with Sprint's funding, then leases the licenses back to Sprint without ever performing any obligations of an Operator. Neither Sprint nor NAUF disclosed that they use this strawman structure to circumvent FCC rules that prohibit commercial entities from holding licenses for Educational Broadband Service.

53.     Sprint and NAUF had a duty to disclose the full set of facts to Huston-Tillotson because they created a false impression by making a partial disclosure that NAUF is an "entity demonstrating capability to perform the obligations of Operator." Sprint and NAUF have further created the false impression that the assignment of rights from Sprint to NAUF is effective and enforceable against Huston-Tillotson, when it is clear that the FCC has not granted consent or approval of any such assignment. Sprint and NAUF have also created the false impression that Huston-Tillotson has an obligation to assist NAUF in the assignment of rights when, according to Section XXII of the Royalty Agreement, the provisions concerning assignment (Section XIII) and any obligations to assist an assignment (Section IV) do not survive the termination of the Royalty Agreement.

54.     Sprint's and NAUF's failure to disclose the full set of facts is material because Section XIII of the Royalty Agreement makes clear that when a proposed assignee cannot demonstrate "capability to perform the obligations of Operator," Sprint "may not assign or transfer

7150346v1/016690

its rights or obligations under [the Royalty Agreement] without the prior written consent" of Huston-Tillotson.

55.     At the time of its partial disclosure to Huston-Tillotson, Sprint and NAUF knew that Huston-Tillotson was ignorant of the facts, and that Huston-Tillotson—a small college without extensive knowledge of backroom deals between Sprint and NAUF—did not have an equal opportunity to discover the facts in the time allotted by Sprint and NAUF. Because Sprint and NAUF sought to take advantage of this information asymmetry, Sprint and NAUF remained deliberately silent when they had a duty to speak.

56.     By failing to disclose the full facts, Sprint and NAUF intended to induce Huston-Tillotson to enter into an assignment, assist with the filing of an assignment, and ultimately acquiesce in an improper acquisition of Huston-Tillotson's EBS license after the Royalty Agreement terminated and before NAUF ever obtained FCC approval to hold such acquisition rights. Sprint and NAUF further intended to induce Huston-Tillotson to refrain from acting in a manner that allowed Huston-Tillotson to obtain fair market value for its EBS license rights. Sprint's and NAUF's bad faith intent are evidenced by Sprint's stated desire to deprive Huston-Tillotson of fair market value with a concocted scheme to buyout Huston-Tillotson's EBS license after the FCC's maximum 15-year term limit expired.

57.     Up until the filing of this lawsuit, Huston-Tillotson relied upon Sprint's and NAUF's non-disclosure by refraining from acting in accordance with its best interests, and entering negotiations or contracts with third parties that would provide fair market value for Huston-Tillotson's EBS license. Huston-Tillotson further refrained from sending Sprint a Right of First Refusal notice because Sprint's and NAUF's non-disclosure created the false impression that

NAUF obtained an effective assignment and that NAUF obtained a right to acquire Huston-Tillotson's EBS license before NAUF ever obtained FCC approval of any purported assignment.

58.     The improper conduct of Sprint and NAUF caused injury to Huston-Tillotson because Huston-Tillotson acted without the knowledge of the undisclosed facts and to date has not obtained (and has not entered a contract to obtain) fair market value for its EBS license.

### SPEEDY HEARING

59.     Pursuant to Federal Rule of Civil Procedure 57, Huston-Tillotson respectfully requests a speedy hearing to resolve its claim for declaratory judgment.

### CONDITIONS PRECEDENT

60.     All conditions precedent to Huston-Tillotson's claims for relief have been performed or have occurred.

### DEMAND FOR JURY TRIAL

61.     Huston-Tillotson hereby demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Huston-Tillotson respectfully requests that judgment be entered in its favor and against Sprint and NAUF as follows:

- On Huston-Tillotson's first cause of action, a speedy hearing and declaration that

  o Sprint and NAUF have no right to acquire Huston-Tillotson's license;

  o Sprint's attempted assignment to NAUF is ineffective without Huston-Tillotson's prior written consent;

  o Sprint and NAUF failed to demonstrate that NAUF is capable of performing the obligations of Sprint as Operator; and

  o Sprint is subject to and must comply with the Right of First Refusal provisions in the Royalty Agreement if it wishes to acquire Huston-Tillotson's EBS license.

- On Huston-Tillotson's second cause of action, awarding compensatory relief for Sprint's breach of the terms of the Royalty Agreement and breach of the implied covenant of good faith and fair dealing under the Royalty Agreement;

- On Huston-Tillotson's third cause of action, awarding compensatory relief for Sprint and NAUF's fraud by non-disclosure that NAUF never intended to perform, and could not perform, the obligations of Operator under the Royalty Agreement;

- For reasonable attorneys' fees;

- For pre-judgment and post judgment interest; and

- Awarding Huston-Tillotson such other and further relief available under the law.

Dated: March 19, 2020

/s/ Chanler A. Langham
Chanler A. Langham
State Bar No. 24053314
clangham@susmangodfrey.com
Armstead Lewis
State Bar No. 24102089
alewis@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: 713-651-9366
Facsimile: 713-654-6666

Daniel R. Malone
dan@danmalonepc.com
MALONE LAW FIRM
P.O. Box 173144
Arlington, Texas 76003

*Attorneys for Plaintiff Hutson-Tillotson University*

### CERTIFICATE OF SERVICE

I certify that on March 18, 2020, a true and correct copy of this document was properly served on counsel of record via electronic filing in accordance with the USDC, Western District of Texas Procedures for Electronic Filing.

/s/ Chanler A. Langham      <br>Chanler A. Langham

7150346v1/016690