IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HUSTON-TILLOTSON UNIVERSITY, | § § § | |
| Plaintiff/Counterclaim Defendant, | § § | |
| v. | § § | 1:20-CV-192-RP |
| SPRINT CORPORATION, NEXTEL SPECTRUM ACQUISITION CORPORATION, and NORTHERN ARIZONA UNIVERSITY FOUNDATION, INC., | § § § § § § § § | |
| Defendants/Counterclaimants. | § | |

## **AMENDED ORDER**

Before the Court is Defendant/Counterclaimant NSAC, LLC ("NSAC")[1] and Northern Arizona University Foundation's ("NAUF") application for a temporary restraining order and preliminary injunction, (Dkt. 30), and associated briefing, (Notice, Dkt. 35 (NAUF joins in NSAC's application); Resp., Dkt. 38; Reply, Dkt. 50). The Court held a telephonic hearing on the application on March 31, 2020. (*See* Order, Dkt. 31). After considering NSAC, NAUF, and Plaintiff/Counterdefendant Huston-Tillotson University's ("HTU") arguments (as expressed in their briefing and at the hearing), the record, and the relevant law, the Court grants NSAC's motion and imposes a preliminary injunction. This ruling prohibits HTU from selling or leasing the spectrum

---

[1] NSAC represents elsewhere that it "was formerly known as Nextel Spectrum Acquisition Corporation, the name that appears in the case caption." (Mot. Seal Counterclaim Compl., Dkt. 23, at 1 n.1). Defendant Sprint Corporation did not join in the application, asserting that it is "not a proper defendant in this case," (App. TRO & PI, Dkt. 30, at 5 n.1), and has filed a motion to dismiss the claims against it for failure to state a claim and lack of personal jurisdiction, (Dkt. 45 at 21–24).

1

band at issue, or any associated rights, to anyone other than NSAC, Defendant Sprint Corporation ("Sprint"), or NAUF until the merits of this case have been resolved.[2]

## I. BACKGROUND

Prior to 2005, the Federal Communications Commission ("FCC") granted HTU an "ITFS" license to broadcast over a certain band of the spectrum meant for educational TV. (Compl., Dkt. 9, at 3). The FCC subsequently opened that band—2.5 GHz, or "mid-band"—to high-speed internet, with HTU retaining the "EBS" license (as it was then called). (*Id.*). Now, in 2020, that band is especially valuable to telecommunications companies, who use it to support their "commercial 3G, 4G, and 5G technology." (*Id.*). In particular, the expansion into 5G service is important and lucrative. *See Transforming the 2.5 GHz Band*, 34 FCC Rcd. 5446, 5447 (2019).[3]

On January 7, 2005, HTU entered into a royalty agreement with Sprint in which it leased to Sprint the ability to use a portion of the 2.5 GHz spectrum it owned. (Compl., Dkt. 9, at 3–4). While the agreement was in effect, HTU could not assign or transfer any interests in the lease without giving Sprint a chance to accept the same terms it offered to the third party, and could not negotiate or contract with a third party to sell the EBS license. (*Id.* at 4). Under the agreement, Sprint made annual royalty payments to HTU. (*Id.*). The agreement allowed Sprint to fully acquire HTU's license for a set price at any time. (*Id.* at 4–5).

The agreement expired on January 7, 2020, per FCC regulations. (*Id.* at 4). HTU argues that Sprint's ability to acquire the license does not survive the agreement. (*Id.* at 5–6).

---

[2] The Court originally issued this Order under seal on April 3, 2020. (Dkt. 54). This Amended Order removes a precise dollar amount which had been previously filed under seal and a provision requiring the parties to show cause for why the original order should not be unsealed. (*See, e.g.*, Compl., Dkt. 9; *see also* Mot. Seal, Dkt. 41). It is identical in all other respects.

[3] "In order to move this spectrum into the hands of those who will provide service, including 5G, to Americans across the country . . . we are replacing an outdated regulatory regime, developed in the days when educational TV was the only use envisioned for this spectrum, with one that not only gives incumbent users more flexibility in how they use the spectrum, but also provides opportunities for additional entities to obtain access to unused 2.5 GHz spectrum."

Near the end of the agreement's term, on October 11, 2019, a third party, SoniqWave Networks, LLC ("SoniqWave"), approached HTU offering higher annual royalties and a far higher purchase option amount. (*Id.* at 6). HTU says the offer "further demonstrated that Sprint's 15-year-old Royalty Agreement contained royalty and acquisition payment amounts that were well-below market value and completely unreasonable for Huston-Tillotson to accept in the current EBS market," and that the extra money "would provide severely needed funding for Huston-Tillotson's educational mission and infrastructure." (*Id.* at 6). HTU represents that it refrained from "earnest contract negotiations" until the agreement expired on January 7, 2020. (*Id.* at 6–7).

Two weeks after SoniqWave's offer, on October 25, 2019, Sprint proposed a one-year renewal of the agreement to HTU that was mostly the same, albeit with "slightly increased" royalty payments. (*Id.* at 7). In HTU's telling, Sprint refused to negotiate and "did not account for the unequal marketing positions and inherent inequality of negotiations between a huge telecommunications conglomerate and small historically black university." (*Id.*). HTU says Sprint "threatened" that it would acquire the license if HTU did not accept the proposal. (*Id.* at 7–8). Still, HTU refused Sprint's proposal. (*Id.* at 8).

One week before the agreement terminated, on December 30, 2019, Sprint notified HTU that it planned to assign its rights to NAUF. (*Id.*). HTU argues that Sprint did not fulfill a number of the agreement's terms that were prerequisites for assignment—in particular, that it did not obtain HTU's written consent. (*Id.*). HTU characterizes NAUF as "a strawman conduit that Sprint uses to strip small educational institutions of their EBS licenses"; "Sprint . . . simply transfer[s] money to NAUF so that NAUF can acquire EBS licenses from small educational institutions, and then lease those licenses right back to Sprint." (*Id.* at 9).

Four days before the agreement terminated, on January 3, 2020, NAUF notified HTU that it was exercising its right to acquire the license. (*Id.* at 11). HTU asserts that this exercise was invalid

3

since NAUF cannot operate the broadcast, as the agreement requires, and that in any case, NAUF had no right to acquire the license after the agreement expired on January 7, 2020. (*Id.*).

On February 18, 2020, HTU sent Sprint a right of first refusal letter offering Sprint the ability to match SoniqWave's offer. (*Id.* at 12). Sprint has 45 days from its receipt of that letter to accept or decline: until April 3, 2020. (*Id.*).

NSAC, a subsidiary of Sprint, argues that this is all a "a case of 'seller's remorse' over the . . . contract price to which [HTU] agreed in 2005, when the spectrum was less valuable." (App. TRO & PI, Dkt. 30, at 5). It says that it asked HTU not to sell its license before this case is resolved and that HTU refused. (*Id.* at 7). If NSAC exercised its purchase option, the agreement obligated HTU to cooperate with it and NAUF to effectuate the sale. (*Id.* at 9–11). Similarly, HTU was obligated to include NSAC in the negotiations with SoniqWave.[4] (*Id.*). In NSAC's telling, HTU's dealings with SoniqWave during the term of the agreement violated the agreement. (*Id.* at 11–12).

In its complaint, HTU seeks declaratory judgment that Sprint and NAUF cannot acquire the license and that they did not fulfill the agreement's terms. (Compl., Dkt. 9, at 18). It also seeks compensatory relief for Sprint's putative breach of the agreement as well as for fraud by nondisclosure related to NAUF's inability to perform its obligations under the agreement. (*Id.* at 19). NSAC and NAUF filed a counterclaim complaint, seeking declaratory judgment in their favor and an order compelling HTU to specifically perform what they argue are its obligations under the agreement. (Dkt. 29 at 14).

## II. LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, the moving party must demonstrate "substantial likelihood of success on the merits, substantial threat of irreparable harm

---

[4] SoniqWave's executives are former Sprint employees who NSAC argues "possess confidential and proprietary information about Sprint's and NSAC's spectrum-licensing operations." (App. TRO & PI, Dkt. 30, at 11–12).

4

absent an injunction, a balance of hardships in [its] favor, and no disservice to the public interest." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). This is a "heavy burden." *Hardin v. Houston Chronicle Pub. Co.*, 572 F.2d 1106, 1107 (5th Cir. 1978).

Even so, the moving party "is not required to prove its case in full at a preliminary injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Instead, the moving party "must present a prima facie case, but need not prove that [it] is entitled to summary judgment." *Daniels Health Scis.*, 710 F.3d at 582. That is, "finding a 'substantial likelihood that movant will ultimately prevail on the merits' does not contemplate a finding of fixed quantitative value." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). But, if the moving party "*cannot* show a substantial likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction." *Butts v. Aultman*, No. 19-60063, 2020 WL 1301048, at *5 (5th Cir. Mar. 19, 2020).

If the moving party surmounts that obstacle, it must then "show that it is 'likely to suffer irreparable harm,' that is, harm for which there is no adequate remedy at law." *Daniels Health Scis.*, 710 F.3d at 582 (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). It must persuade the Court that "the competing claims of injury" and "the effect on each party of the granting or withholding of the requested relief" weigh in its favor. *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). And it must demonstrate that the "public consequences in employing the extraordinary remedy of injunction," to which "courts of equity should pay particular regard," militate in favor of injunctive relief. *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

### III. ANALYSIS

#### A. Likelihood of Success

NSAC and NAUF have sufficiently demonstrated a likelihood of success on the merits for purposes of the preliminary injunction analysis. *See generally* 11A Charles A. Wright, et al., *Federal Practice and Procedure* § 2948.3 (3d ed. Aug. 2019 update) ("The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a *preliminary estimate* of the strength of plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case.") (emphasis added). In the parties' briefing and at the hearing, two key issues emerged: HTU's putative obligation to disclose SoniqWave's offer to NSAC and NSAC's putative assignment of its purchase option to NAUF. The Court discusses each in turn.

##### 1. Disclosing the SoniqWave Offer

NSAC argues that HTU was obligated to "promptly" disclose SoniqWave's offer and failed to do so. (App. TRO & PI, Dkt. 30, at 16, 18–19). NSAC points to § III of the agreement, which states that "[HTU] will provide [NSAC] with copies of all such bids, proposals, offers, counter-bids, and counter-offers promptly after they are received by [HTU]." (Reply App. TRO & PI, Dkt. 50, at 8–9; Agreement, Dkt. 39-1, at 5). HTU counters that this provision "only applies to instances in which Huston-Tillotson actively issues or solicits bids, proposals, or offers for the sale of the License[,] . . . not an unsolicited offer from a third party." (Resp. App. TRO & PI, Dkt. 38, at 15–16). But that interpretation does not conform with the beginning of § III, which specifies obligations that apply "[i]n the event that [HTU] decides to consider, issue or to solicit bids, proposals or offers for the sale, assignment, transfer or use of any part or the whole of the ITFS Channels or Licenses at any time before the fifth (5th) anniversary of the end of this Agreement." (Agreement, Dkt. 39-1, at 4). It is undisputed that HTU decided to consider SoniqWave's offer—indeed, its decision to do so is much of the impetus for this case. Therefore, the obligations specified in § III applied. HTU

violated the agreement by failing to promptly disclose SoniqWave's offer to NSAC. HTU's arguments about whether it properly provided NSAC with a right of first refusal notice do not alter this analysis. (*See* Resp. App. TRO & PI, Dkt. 38, at 15–16).

## 2. Assigning the Purchase Option

HTU maintains that NSAC's assignment of the license purchase option to NAUF was invalid and ineffective. (Resp. App. TRO & PI, Dkt. 38, at 17). Because NAUF itself could not perform the technical duties of a broadcast operator, HTU contends, NSAC could not assign any rights to NAUF under § XIII(a)(1) of the agreement, which dictated that NSAC could only assign rights to an "entity demonstrating capability to perform the obligation of Operator." (*Id.* at 2 (quoting Agreement, Dkt. 39-1, at 10)). Otherwise, to assign rights to an entity incapable of performing those duties, NSAC was required to obtain HTU's consent first. (*Id.*). NSAC points out, though, that a specific provision in the agreement concerned NSAC's right to acquire the license altogether—the purchase option—and allowed NSAC to "exercise such right itself or to assign such right to [NSAC's] designee." (Reply App. TRO & PI, Dkt. 50, at 6; Agreement, Dkt. 39-1, at 6).

Virginia law applies to the interpretation of the agreement, as designated by the agreement's own choice-of-law provision in the agreement. (App. TRO & PI, Dkt. 30, at 15 n.6). "Virginia follows the well-settled principle in contract law of applying specific provisions of a contract over more general provisions dealing with the same subject matter." *Levine v. Employers Ins. Co. of Wausau*, 887 F.3d 623, 630 (4th Cir. 2018). Consequently, the agreement's provision that deals specifically with assignment of the purchase option, § IV(f), controls over the more general provision that HTU cites, § XIII(a)(1). The Court does not reach the parties' arguments concerning the ability of NAUF itself, as opposed to a technical operator with whom it could contract, to perform the tasks

7

necessary to use the spectrum band at issue, or the effect of the FCC's current or future regulations on any such assignment.[5]

**B. Irreparable Harm**

NSAC and NAUF have also demonstrated a likelihood that they will suffer irreparable harm should HTU sell or otherwise dispose of the license prior to the ultimate adjudication of the merits of this case.[6]

At the hearing, NSAC emphasized that a service provider's ability to access a contiguous block of the spectrum helps ensure network stability and performance and that the contiguity of that block (rather than the total number of channels within it) is its crucial characteristic. Though the Fifth Circuit has not explicitly held that a loss of a portion of the spectrum is per se irreparable harm, the Eighth Circuit has deemed it to have "unique characteristics that make its loss one which cannot be fully compensated by an award of money damages." *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007).[7] To bolster this persuasive authority, NSAC points to the fact that § XIX of the agreement provides that "[t]he rights granted by this Agreement are of a special, unique, unusual and extraordinary character, the loss of which cannot be adequately redressed by damages" and that "[t]he breach by either party of any material provision hereof will cause the other party irreparable injury." (App. TRO & PI, Dkt. 30, at 11). HTU notes, though, that "[c]ontractual

---

[5] Nor does the Court reach the parties' arguments about whether HTU was obliged to immediately assist in effecting the assignment to NAUF by following certain FCC procedures. (*See* App. TRO & PI, Dkt. 30, at 16; Resp. App. TRO & PI, Dkt. 38, at 20–21).

[6] Though HTU argued at the hearing that neither NAUF nor Sprint demonstrated that they (as opposed to NSAC) would suffer irreparable harm without an injunction, the Court does not reach that issue because the harm to NSAC that NSAC has demonstrated comprises a sufficient basis for injunctive relief.

[7] In tandem with *PCTV Gold*, NSAC also cites *GDC Technics, Ltd. v. Grace*, in which this Court discussed the impending sale of a FAA-issued supplemental type certificate ("STC") in the context of a preliminary injunction analysis. No. 5:15-CV-488-RP, 2017 WL 123781 (W.D. Tex. Jan. 11, 2017). Though the STC concerned "a modification that enables an aircraft to receive live television broadcasts while in flight," it was not an exclusive license to broadcast on a particular band of the spectrum, contrasting with *PCTV Gold* and this case. *Id.* at *1. Accordingly, while the Court held that "money damages resulting from the loss of the STC may be difficult to calculate or unrecoverable," its holding in that context should not be interpreted as creating or imposing a per se rule for spectrum bands, as *PCTV Gold* arguably does. *Id.* at *2.

8

stipulations of 'irreparable harm' . . . however, are insufficient by themselves to support a finding of irreparable harm to support injunctive relief." *Traders Int'l, Ltd. v. Scheuermann*, No. CIV.A. H-06-1632, 2006 WL 2521336, at *8 (S.D. Tex. Aug. 30, 2006) (collecting cases); (Resp. App. TRO & PI, Dkt. 38, at 21). While the provision alone may not be sufficient, it is not irrelevant.

In addition, HTU argues that NSAC cannot "establish irreparable harm because [it] still has the opportunity to accept the terms and conditions presented in the [right of first refusal] Notice." (Resp. App. TRO & PI, Dkt. 38, at 22). If NSAC were to exercise its right to match SoniqWave's offer, HTU suggests, NSAC could evade any potential harms. (*See id.*). NSAC protests, contending that such an outcome would allow litigants to "defeat a preliminary injunction motion simply by demanding a monetary ransom to remove the threat." (Reply App. TRO & PI, Dkt. 50, at 10 (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 n.8 (1st Cir. 1996) ("Baccarat suggests that Ross–Simons could—and still can—avoid any harm simply by signing the Proposed Agreement . . . . The law—much less a court of equity—should not compel a litigant to sign away the farm in order to save the crops."))). While the Court does not characterize this dispute in as dire terms, NSAC's logic holds true. Just as HTU argues that an injunction could "grant[] [NSAC] all the relief it has requested in this lawsuit without an adjudication of the merits," so too could withholding an injunction on this ground unduly grant HTU similarly premature relief. (Resp. App. TRO & PI, Dkt. 38, at 23).

NSAC also argues that because HTU may not have the financial resources to pay a money judgment if it does not ultimately prevail, injunctive relief is appropriate. (App. TRO & PI, Dkt. 30, at 22–23; Reply App. TRO & PI, Dkt. 50, at 12); *see Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 n.56 (5th Cir. 2014) (citing *Molex, Inc. v. Nolen*, 759 F.2d 474, 477 (5th Cir. 1985)) (noting that "a plaintiff's inability to obtain monetary compensation from an insolvent defendant" may constitute irreparable harm). HTU does not address this argument. It is within the Court's discretion

9

to consider this aspect of the propriety of injunctive relief, and the Court does so, finding it weighs in favor of a finding of potential irreparable harm to NSAC. *See Aspen Tech.*, 569 F. App'x at 273.

### C. Balance of Hardships

The Court finds that the balance of hardships tilts in favor of NSAC. If it is ultimately determined that NSAC and NAUF validly exercised the purchase option for the license, and in the meantime, HTU has sold it, NSAC and NAUF will have suffered a harm proportional to the uniqueness of the spectrum band. Meanwhile, at the hearing, the Court asked HTU to pinpoint the harms it would suffer if an injunction were to be granted—i.e., if it were not permitted to accept SoniqWave's offer as soon as possible. HTU suggested that it could lose SoniqWave's offer and might be subject to penalties imposed by FCC rules which are not yet in effect. These speculative harms, whose severity is not altogether clear, do not tip the balance in HTU's favor.

### D. Public Interest

Finally, the Court concludes that here, "[i]t is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed." *Marquis Software Sols., Inc. v. Robb*, No. 3:20-CV-0372-B, 2020 WL 955901, at *11 (N.D. Tex. Feb. 27, 2020) (quoting *Amerispec, Inc. v. Metro Inspection Servs., Inc.*, No. CIV.A.3:01-CV-0946-D, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001)); *see also PCTV Gold*, 508 F.3d at 1145. Whether HTU or Defendants ultimately prevail, the outcome will have upheld the contract and enforced the agreed remedy.

The Court notes, however, that NSAC also asserts "the public . . . interest in a high-performing telecommunications network," which it argues is harmed by its inability to operate on the spectrum band. (Reply App. TRO & PI, Dkt. 50, at 13). Universal access to a strong telecommunications network may well be in the public interest. But framing that interest in terms of the public's access to *Sprint's* high-performing network, as NSAC does, elides the point. Sprint and

NSAC's ability to provide services to their customers is not synonymous with the public's interest in a strong network overall.

## IV. CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that NSAC and NAUF's application for a temporary restraining order and preliminary injunction, (Dkt. 30), is **GRANTED IN PART**. Their application for a preliminary injunction is **GRANTED**. Their application for a temporary restraining order is **MOOT**.[8]

**IT IS FURTHER ORDERED** that HTU, its employees, representatives, agents, and all persons or entities acting in concert with them are enjoined from selling or leasing the spectrum band at issue, or any associated rights, to anyone other than NSAC, Sprint, or NAUF until all of the claims in this case have been finally adjudicated, including all appeals.

**SIGNED** on April 7, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[8] HTU, as the adverse party, has been provided sufficient notice and opportunity to be heard as required for a preliminary injunction to issue, as opposed to an ex parte temporary restraining order. *See* Fed. R. Civ. P. 65(a); 11A Charles A. Wright, et al., *Federal Practice and Procedure* § 2947 (3d ed. Aug. 2019 update).